IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**VICKIE SMITH,**              :       **Civil No. 1:05-CV-01003**
                               :
       **Plaintiff**           :       **JUDGE SYLVIA H. RAMBO**
                               :
    **v.**                     :
                               :
**CENTRAL DAUPHIN SCHOOL**     :
**DISTRICT, BARBARA HASSON,**  :
**YVONNE HOLLINS, and**        :
**RICHARD MAZZATESTA,**        :
                               :
       **Defendants**          :

**M E M O R A N D U M**

Before the court is Defendants' motion for summary judgment on
Plaintiff's claim of employment retaliation in response to her exercise of her First
Amendment right to free speech. Plaintiff alleges numerous acts of retaliation taken
by Defendants because she investigated and made public her concerns about the air
quality in certain school buildings within Central Dauphin School District. Plaintiff
was a teacher within the School District for the times pertinent to this suit. Her
claims revolve around her teaching position and her position as an assistant coach
for the cross-country team at Central Dauphin High School. For the reasons that
follow, summary judgment will be denied in part and granted in part.


I.        **Background**

          A.    **Facts**

          The following facts are undisputed, except where noted. Defendants
Dr. Barbara Hasson, Yvonne Hollins, and Richard Mazzatesta were employed by
Defendant Central Dauphin School District ("School District"). Defendant Hasson
was the District Superintendent from 1996 through July 7, 2005. (Hasson Dep. I

10:8-21, May 17, 2006.)  Defendant Hollins was Assistant Superintendent for Secondary Education through July 12, 2004.  (Hollins Dep. I 15:5-14; 59:21-24, May 26, 2006.)  Defendant Mazzatesta was, and is, Principal of Central Dauphin High School.  (Mazzatesta Dep. I 6:19-22, May 17, 2006.)  Plaintiff Vickie Smith is a teacher in the Central Dauphin School District.

### 2.   Teaching

#### a.   Old Central Dauphin High School[1]

Plaintiff Vickie Smith was first hired by the School District as a long-term substitute teacher in 1988.  (Defs.' Stmt. of Mat'l Facts ¶ 1; Pl.'s Counter-Stmt. of Mat'l Facts ¶ 1.)  She became a full-time, permanent employee of the School District in school year 1989-90, teaching at old Central Dauphin High School ("CDHS").  (Defs.' Stmt. of Mat'l Facts ¶ 3; Pl.'s Counter-Stmt. of Mat'l Facts ¶¶ 3, 11.)

In August 2001, while still teaching at old CDHS, Plaintiff began experiencing symptoms of illness, including shortness of breath, fatigue, and joint problems.  (Defs.' Stmt. of Mat'l Facts ¶ 13; Pl.'s Counter-Stmt. of Mat'l Facts ¶ 13.)  She spoke to other teachers and the school nurse, some of whom were having similar chronic symptoms of illness.  (Defs.' Stmt. of Mat'l Facts ¶ 19; Pl.'s Counter-Stmt. of Mat'l Facts ¶ 19.)  Plaintiff also contacted her union representative, Tom Ferguson.  (Ferguson Dep. 59:16-24, May 26, 2006.)  In response to many complaints, the teachers' union circulated a survey to the teachers

---

[1]  There are two buildings identified as "Central Dauphin High School" ("CDHS") in the context of this matter.  "Old" CDHS was located on Locust Lane, Lower Paxton Township, Pennsylvania.  "New" CDHS, located on Piketown Road, West Hanover Township, Pennsylvania, was complete for the 2004-05 school year.  Throughout this memorandum, the court will use "old" and "new" to differentiate between the two buildings.

asking about their health concerns.  (Defs.' Stmt. of Mat'l Facts ¶ 14; Pl.'s Counter-Stmt. of Mat'l Facts ¶ 14.)  The results of the survey, completed in October 2001, plus complaints from students and parents, indicated that old CDHS was adversely affecting the health of its occupants.  (Defs.' Stmt. of Mat'l Facts ¶ 15; Pl.'s Counter-Stmt. of Mat'l Facts ¶ 15.)  The union shared the results of the testing with Defendant Hasson in December 2001 and January 2002.  (Smith Dep. I 50:10-52:18, Sept. 22, 2006.)

In or after February 2001, Defendant Hasson met with the teachers' union co-presidents and other administrative personnel to talk about Plaintiff's health concerns.  (Hasson Dep. I 55:5-56:8.)  Defendant Hasson agreed to have the old CDHS building tested.  (*Id.* at 56:18.)  The School District contracted with Analytical Laboratory Services, Inc. ("ALSI") to perform testing at old CDHS to determine the source of the problems.  Testing began on or about February 15, 2001.

Plaintiff's symptoms worsened over the course of the 2001-02 school year.  She saw physicians and specialists to determine the cause of her illness.  (*See* Pl.'s Counter-Stmt. of Mat'l Facts ¶ 19.)  On February 7, 2002, Plaintiff went on sick leave.  (Smith Dep. I 66:17-21.)  On the same date, she notified the School District's human resources office that her symptoms were caused by old CDHS. (*See* Pl.'s Counter-Stmt. of Mat'l Facts ¶ 19.)  She also filed a worker's compensation claim.[2]  (Smith Dep. I 54:3-15; Pl.'s Ex. 8.)  Dr. Bogdon, Plaintiff's family doctor, advised her to go on a medical leave of absence from work.  Dr. Bogdon suspected that Plaintiff's respiratory problems resulted from exposure to mold at old CDHS (Pl.'s Ex. 13), but her condition was not concretely diagnosed

---

[2]  Her claim was denied on or about March 15, 2002.  (Pl.'s Ex. 9.)

(Defs.' Stmt. of Mat'l Facts ¶ 36; Pl.'s Counter-Stmt. of Mat'l Facts ¶ 36).  Plaintiff began medical leave as of February 22, 2002.  (Decl. of Vickie Smith ¶ 9.)

Plaintiff filed a complaint regarding the environmental conditions at old CDHS with the Department of Labor on March 11, 2002.  (*See* Smith Dep. I 73:22-74:16)  She filed a similar complaint with the Department of Health on March 12, 2002.  (*See id.*; Gostin Dep. 6:11-21, Oct. 23, 2006.)  Judith Gostin, an industrial hygienist and occupational health program director at the Department of Health, spoke with Plaintiff.  (Gostin Dep. 6:11-21.)  Ms. Gostin contacted Defendant Hasson soon after.  (*Id.* at 9:4-12.)  In their phone conversation, Ms. Gostin and Defendant Hasson set a time to meet and discuss the health concerns at old CDHS within a few weeks.  (*Id.* at 9:21-25.)

During March and April, Defendant Mazzatesta informed the Parent-Teacher-Student Organization at old CDHS that the testing showed normal results and there was nothing wrong with the building.  (Hoachlander Dep. 8:13-9:2, May 26, 2006.)  On March 16, 2002, following a report in the Harrisburg *Patriot-News* that mold was found at old CDHS, Defendant Hasson appeared on the local news and stated that the school was safe.  (Pl.'s Counter-Stmt. of Mat'l Facts ¶ 21.)

On March 18, 2002, Plaintiff requested a copy of the "initial findings" produced by ALSI after testing on old CDHS from Bill Irwin of the School District human resources department.  (*Id.*)  She was seeing a doctor on or about that date and hoped to bring information about the environment at old CDHS with her to the appointment.  (Pl.'s Ex. 14.)  Plaintiff then called the office of the superintendent to request a copy of the report.  Dr. Bogdon was faxed a copy of the preliminary report on the same day.  On March 29, 2002, Plaintiff discovered that three pages, which

included the test results and ALSI's recommendations to the School District, were missing from the preliminary report faxed to Dr. Bogdon.  Later, Plaintiff learned that the pages were missing because ALSI "asked that those be left out until a more conclusive report [was] available."  (Pl.'s Ex. 29.)

Defendant Hasson met with Ms. Gostin, Mr. Ferguson, Defendant Mazzatesta, a representative from ALSI, and other administrators on March 26, 2002, to discuss the teachers' concerns about the environment at old CDHS and the information produced by ALSI.  (Gostin Dep. 10:1-13:2.)  It appears that the final report from ALSI was not publicly available until on or about the date of this meeting, March 26, 2002.  (*Id.*; *see* Pl.'s Ex. 17.)  The same day, Ms. Gostin toured old CDHS with Mr. Ferguson to visually inspect the building.  (Gostin Dep. 13:2-14:18.)  Mr. Ferguson testified that when they first arrived, Defendant Mazzatesta would not let them in to the building to inspect the problem areas.  (Ferguson Dep. 15:1-17.)  After consulting Defendant Hasson, Defendant Mazzatesta allowed them to tour the school independently.  (*Id.*)  Ms. Gostin did not recall Defendant Mazzatesta impeding their inspection.  (Gostin Dep. 14:11-18.)

In April 2002, Plaintiff saw Dr. Shoemaker, a specialist in chronic fatigue (Pl.'s Ex. 36), and Dr. Bascom, a specialist in pulmonary, allergy, and critical care (Pl.'s Ex. 58).  The advised Plaintiff to return to work as a test.  They sought to determine whether her return to old CDHS would aggravate her condition.  (Defs.' Stmt. of Mat'l Facts ¶ 37; Pl.'s Counter-Stmt. of Mat'l Facts ¶ 37.)  In advance of her return, Defendant Hasson issued a memorandum to Defendant Mazzatesta, with a copy to Defendant Hollins, requesting that Defendants Mazzatesta and Hollins meet with Plaintiff before she returned to the classroom.

(Pl.'s Ex. 31.)  It was Defendant Hasson's "understanding that [Plaintiff] was teaching about the environmental conditions in the building and her interpretation of the air problems." (*Id.*)  She asked them to advise Plaintiff that such discussions in class are inappropriate because they are not elements of approved curriculum. (*Id.*)  They were instructed to tell her that she must "[s]tick to the curriculum and not elaborate on her health conditions" and that she would be supervised directly. (*Id.*)

When Plaintiff arrived on the morning of April 29, Defendants Hollins and Mazzatesta met her at her mailbox.  The tone and tenor of the meeting, from Plaintiff's perspective, was hostile.  Plaintiff states that these Defendants "threatened" regarding teaching anything but curriculum.  (Pl.'s Counter-Stmt. of Mat'l Facts ¶ 39; Smith Dep. I 126:10-127:1.)  Nothing in the record reflects Defendant Hollins's or Defendant Mazzatesta's recollection of the meeting.

Within twenty-four hours of her return to old CDHS, Plaintiff's symptoms returned.  (Defs.' Stmt. of Mat'l Facts ¶ 41; Pl.'s Counter-Stmt. of Mat'l Facts ¶ 41.)  In spite of her severe reaction, she continued to teach at old CDHS through May 15, 2002.  (Defs.' Stmt. of Mat'l Facts ¶ 42; Pl.'s Counter-Stmt. of Mat'l Facts ¶ 42.)  She went on medical leave as of May 16, 2002.  (Defs.' Stmt. of Mat'l Facts ¶ 43; Pl.'s Counter-Stmt. of Mat'l Facts ¶ 43.)

By late May 2002, Plaintiff's physicians informed her that she should not return to old CDHS, lest she suffer a permanent and profound respiratory disability.  (Pl.'s Ex. 19; Sullivan Dep. 44:5-22, Oct. 16, 2006; Bascom Dep. 11:18-25, Oct. 17, 2006).  On May 22, 2002, Plaintiff contacted Mr. Irwin to ask about the protocol for requesting a transfer.  (Pl.'s Ex. 19.)  Mr. Irwin told her to send a formal, written, request for transfer to his attention.  (*Id.*)  The next day, before

Plaintiff made an official request, Mr. Irwin sent her a letter informing her that she was to be transferred from her social studies position at old CDHS to teach social studies at Linglestown Junior High School ("LJHS").  (Pl.'s Ex. 20.)  According to Mr. Ferguson, the transfer was rational in light of Plaintiff's health concerns. (Ferguson Dep. 18:6-17.)  LJHS was one of few air-conditioned buildings in the School District and had recently been remediated.[3]  (*Id.*)  It was "the most environmentally safe place for [Plaintiff] to work."  (*Id.*; *see* Hasson Dep. I 95:5-19.)

On June 12, 2002, Plaintiff issued a press release, under her name, identifying her health problems, her complaints to the Department of Labor and the Department of Health, and her impression that the School District had "turn[ed] a blind eye" to the health concerns of its teachers and students.  (Pl.'s Ex. 33 at 2.) The Paxton Herald picked up the release, turning it into an article with the headline "Local Teacher Breaks Silence On Toxic Mold In C.D. High."  (Pl.'s Ex. 57.)  Upon learning of the press release, Defendant Hasson faxed a copy to counsel for the School District stating her belief that the release was "a clear violation" of Plaintiff's contract with the School District and requesting advice.  (Pl.'s Ex. 33 at 1.)

Later in June, Defendant Mazzatesta is alleged to have learned that a parent member of the Parent-Teacher-Student Organization at old CDHS, Deb Hoachlander, had been corresponding with Plaintiff regarding the mold situation at old CDHS.  (Hoachlander Dep. 31:13-32:18.)  He told Ms. Hoachlander that, in his opinion, Plaintiff was spreading "falsehoods" through the news media about air safety at old CDHS.  (*Id.*)  He asked Ms. Hoachlander to forward Plaintiff's emails

---

[3]  Remediation is the process by which an area of a building, known to be affected by mold, is cleaned, rebuilt, reconditioned or otherwise restored to eliminate the contamination.

or, alternatively, he offered to go to Ms. Hoachlander's house to read them on her computer. (*Id.* at 32:19-33:11.)  Ms. Hoachlander got the impression that Defendant Mazzatesta sought the emails to discredit Plaintiff. (*Id.* at 49:2-24.)  Defendant Mazzatesta does not recall the specific conversation, but did remember asking someone to show him the contents of an email rather than paraphrasing it to him. (Mazzatesta Dep. I 47:11-14.)  Ultimately, Ms. Hoachlander forwarded some emails from Plaintiff having to do with web sites about mold as it affects indoor air quality. (Hoachlander Dep. 33:22-34:1.)

### b.   Linglestown Junior High School

In July 2002, Plaintiff met with Gus Zemba, the principal of LJHS. (Smith Dep. I 96:25.)  She requested documentation about the history of mold growth and air quality at the school. (*Id.* at 97:4-7.)  He told her to contact the School District Solicitor's office for that information. (Smith Dep. I 97:10-12.)  He also told her to have her physician make the request in writing. (Pl.'s Ex. 35.)  Mr. Ferguson sent a letter to Mr. Irwin requesting the same information on August 7, 2002. (*Id.*)  Dr. Bascom wrote to Mr. Zemba on August 12, 2002. (Pl.'s Ex. 36.)  She indicated that if it was likely that the building had mold growth, Plaintiff "should work elsewhere." (*Id.*)  On August 15, 2002, Defendant Hasson advised Plaintiff that she, Mr. Zemba, and Mr. Irwin were in the process of responding to Plaintiff's requests and anticipated providing a response in two weeks. (Pl.'s Ex. 64.)

In Defendant Hasson's letter to Plaintiff, she also inquired as to whether Plaintiff would be reporting for work at LJHS for the 2002-03 school year. (*Id.*)  She asked Plaintiff to inform Defendant Hollins if Plaintiff would be returning

8

or if Plaintiff would be "requesting leave pursuant to the Family Medical Leave Act by completing the enclosed application." (*Id.*)  Plaintiff reported for work at LJHS.

On September 6, 2002, Plaintiff's worker's compensation attorney sent a request to counsel for the School District for information on LJHS.  (Pl.'s Ex. 63.) Mr. Ferguson sent another letter to Mr. Irwin on September 11, 2002, with another request for information as to mold growth and air quality information at LJHS. (Pl.'s Ex. 37.)

Defendant Hasson responded to Dr. Bascom on September 27, 2002. (Pl.'s Ex. 38.)  She related that there had been leaks in the roof in the past, but that repairs had been made quickly enough to reduce the possibility of resultant mold. (*Id.*)

It appears, however, that mold was discovered near the gymnasium of LJHS on June 14, 2002, the result of a leaky water fountain.  (Pl.'s Ex. 39.) Defendant Hasson was notified of the mold on or about June 20, 2002.  (Pl.'s Ex. 40.)  The assistant principal of LJHS wrote a memo to her stating that an environmental specialist would visit to assess the problem and that he would provide their findings immediately.  (*Id.*)  On July 24, 2002, ALSI reported on the environmental quality of LJHS.  (Pl.'s Ex. 41.)  ALSI suggested remediation for the area surrounding the leaky water fountain.  (*Id.*)  At the time Defendant Hasson wrote to Dr. Bascom, the School District was in the process of repairing the floor in the affected area of the gymnasium, removing the mold, and remediating the area. (*Id.*)

After remediation, on December 30, 2002, ALSI sampled the air in the area where water damage and fungal contamination were removed and concluded

that the air at LJHS was normal.  (Pl.'s Ex. 42.)  ALSI indicated that the level of fungal spore concentrations "should not affect or cause complaints among most occupants."  (*Id.*)

At the end of the 2002-03 school year, Plaintiff was still having problems with her health, though not as severe as when she taught at old CDHS.  (Defs.' Stmt. of Mat'l Facts ¶¶ 54-55; Pl.'s Counter-Stmt. of Mat'l Facts ¶¶ 54-55.) Plaintiff's doctors linked her health problems to an inhalation injury due to exposure to mold at old CDHS and continued exacerbation of the injury from exposure to mold at LJHS.  (Defs.' Stmt. of Mat'l Facts ¶ 56; Pl.'s Counter-Stmt. of Mat'l Facts ¶ 56; Smith Dep. I 108:17-25.)  Plaintiff's doctors wrote a report to that effect and sent it to Defendant Hasson in June 2003.  (Defs.' Stmt. of Mat'l Facts ¶ 57; Pl.'s Counter-Stmt. of Mat'l Facts ¶ 57.)  Dr. Bascom informed Plaintiff that she would have to be out of an "exposed environment" for two years to even begin to recover her lung capacity.  (Defs.' Stmt. of Mat'l Facts ¶ 59; Pl.'s Counter-Stmt. of Mat'l Facts ¶ 59.)

Plaintiff's doctors were concerned that it was not safe for her to teach at either old CDHS or LJHS.  (Defs.' Stmt. of Mat'l Facts ¶ 63; Pl.'s Counter-Stmt. of Mat'l Facts ¶ 63.)  On May 24, 2003, Dr. Shoemaker advised Defendant Hasson that if Plaintiff continued to work in a contaminated environment, like old CDHS and LJHS, she was "likely to become 100% disabled by virtue of her occupationally acquired illness."  (Pl.'s Ex. 50 at 5.)  Dr. Bascom also advised Plaintiff not to return to LJHS.  (Bascom Dep. 15:5-12.)  Thus, Plaintiff approached Mr. Ferguson about requesting alternative work arrangements for the coming 2003-04 school year. (Defs.' Stmt. of Mat'l Facts 65 ¶ ; Pl.'s Counter-Stmt. of Mat'l Facts ¶ 65.)

In June 2003, Mr. Ferguson suggested to Defendant Hollins that Plaintiff be assigned to home-bound teaching or an alternative education center such as Dauphin County Prison.  (Pl.'s Ex. 48 at 3; Ferguson Dep. 27:8-28:1.)  He informed Defendant Hollins that LJHS was not safe for Plaintiff, bringing doctors' reports in support.  (Pl.'s Ex. 48 at 1.)  He sent a letter with the same information in August 2003, requesting accommodation by the School District because Plaintiff wanted to continue to teach.  (Pl.'s Ex. 49.)  Also in August, Mr. Ferguson wrote to Mr. Irwin about alternatives for Plaintiff.  (Pl.'s Ex. 48 at 1; Pl.'s Ex 61.)  Mr. Ferguson met with Defendant Hollins on August 14, 2003.  (Pl.'s Ex. 48.)  Defendant Hollins indicated that Plaintiff was still assigned to LJHS for the coming school year, but agreed that it was not safe for Plaintiff to be in the building.  (*Id.*)  According to Mr. Ferguson, Defendant Hollins indicated that she would support Plaintiff's request, if made, for benefits under the Family Medical Leave Act ("FMLA").  (*Id.*)  Mr. Ferguson told her that an FMLA solution was not in Plaintiff's best interests.  (*Id.*)  Mr. Ferguson emailed Defendant Hasson on August 18, 2003, to inquire again about Plaintiff's status in the School District for the coming school year, indicating that Defendant Hollins directed him to Defendant Hasson as to Plaintiff's proposed alternative assignment for the school year.  (Pl.'s Ex. 62.)

The School District did not have any alternative positions suitable for Plaintiff for the 2003-04 school year.[4]  (Defs.' Stmt. of Mat'l Facts ¶ 68; Pl.'s

---

[4]  Plaintiff's statement of material facts repeatedly states that there were two positions open, but the School District failed to inform her of them or give them to her.  (Pl.'s Counter-Stmt. of Mat'l Facts ¶¶ 65, 74.)  Plaintiff's citations therein do not support this assertion and the court has been unable to find record evidence in support.

Counter-Stmt. of Mat'l Facts ¶ 68.)

### c.   **Medical Leave**

On Monday, August 25, 2003, the School Board approved FMLA leave for Plaintiff, effective August 18, 2003.  (Pl.'s Ex. 54.)  It is undisputed that Plaintiff did not request the leave.  The record is unclear as to who, exactly, requested it for her such that the School Board could subsequently approve it.  Defendant Hollins testified that she was not personally involved with the decision because human resources would have handled that kind of request.  (Hollins Dep. I 32:10-19; 34:7-11.)  Defendant Mazzatesta had no role in placing her on FMLA leave.  (Smith Dep. I 167:4-10; *see* Mazzatesta Dep. I 74:5-16.)

Mr. Ferguson advised Plaintiff that, to protect her employment status within the School District once she exhausted her FMLA leave, she should take a medical sabbatical.  (Smith Dep. I 117:24-118:5; Ferguson Dep. 29:16-31:2.)  To that end, Plaintiff sent a written request for medical sabbatical to Mr. Irwin on September 5, 2003.  (Pl.'s Ex. 53.)  In the letter, she again requested a work accommodation.  (*Id.*)  On September 22, 2003, the School Board approved her request for medical sabbatical, effective for school year 2003-04.  (Pl.'s Ex. 55.)  She received half of her regular salary while on medical sabbatical.  (Defs.' Stmt. of Mat'l Facts ¶ 72; Pl.'s Counter-Stmt. of Mat'l Facts ¶ 72.)  Plaintiff claims that this sabbatical was "forced" upon her by Defendants.  There is no evidence that Defendant Hasson had a role in the advent of Plaintiff's medical sabbatical.  (Defs.' Stmt. of Mat'l Facts ¶ 149; Pl.'s Counter-Stmt. of Mat'l Facts ¶ 149.)  Defendant Hollins did not personally discuss a sabbatical with Plaintiff or take any action on the matter.  (Hollins Dep. I 35:11-18; Smith Dep. I 168:12:15.)  Defendant

Mazzatesta also had no role in her medical sabbatical.  (Smith Dep. I 167:12-15; *see* Mazzatesta Dep. I 76:9-19.)

Plaintiff filed a complaint with the Pennsylvania Human Relations Commission in September 2003.  (Smith Dep. I 148:15-149:5.)  She also filed a second complaint with the Department of Labor at or about that time.  (*Id.*)

### d.   New Central Dauphin High School

The School District completed construction on new CDHS while Plaintiff was on medical sabbatical.  (Defs.' Stmt. of Mat'l Facts ¶ 75; Pl.'s Counter-Stmt. of Mat'l Facts ¶ 75.)  The School District spent more than $200,000 to prevent any mold growth in the new building.  (Defs.' Stmt. of Mat'l Facts ¶ 79; Pl.'s Counter-Stmt. of Mat'l Facts ¶ 79.)  Plaintiff was assigned to new CDHS for school year 2004-05.  (Defs.' Stmt. of Mat'l Facts ¶ 75; Pl.'s Counter-Stmt. of Mat'l Facts ¶ 75.)

### i.   Teaching Assignment

Plaintiff learned that she would be teaching at new CDHS in April 2004.  (Smith Dep. I 156:18-22.)  She contacted the social studies department head at the school, Kathy Eckert.  (*Id.* at 156:21-157:2.)  Plaintiff asked Ms. Eckert if she would be allowed to teach the same subjects for which she had written the curriculum and which she had always taught, multicultural history and sociology. (*Id.* at 157:12-18; Smith Dep. II 282:23-25, Nov. 27, 2006.)

The process for determining which teacher will teach which subjects in the CDHS social studies department appears to be as follows: during April, the department head confers with the teachers to determine who would like to teach which subjects.  (Smith Dep. I 157:2-25; Mazzatesta Dep. I 83:24-84:4.)  With that

input, the department head reports the requests to the principal.  (Mazzatesta Dep. I 84:1-4.)  The principal then decides who will teach which subject for the following school year.  (*Id.* at 84:1-15.)

During the 2003-04 school year, a Mr. Osovella taught multicultural history and sociology.  (*Id.*)  Ms. Eckert recommended that Plaintiff teach those subjects for the 2004-05 school year.  (*Id.*)  Defendant Mazzatesta asked Mr. Osovella whether he wanted to drop those courses; Mr. Osovella said no.  (*Id.*)  Thus, it appears that Defendant Mazzatesta put multicultural history and sociology on Mr. Osovella's teaching slate for the following year, not Plaintiff's.  (*See id.*)

Ms. Eckert then informed Plaintiff that she would be teaching world cultures and U.S. history, subjects with which Plaintiff was unfamiliar and did not enjoy.  (Smith Dep. I 158:1-5.)  Plaintiff taught those classes during school year 2004-05.

In April 2005, the same process of feedback and reporting occurred among the department head and teachers in the social studies department.  (*Id.* at 182:9-22.)  Plaintiff approached Mr. Osovella and asked if she could take over multicultural history and sociology.  (*Id.* at 182:21-183:11.)  He said no.  (*Id.* at 183:4-11.)  It is unclear what recommendations Ms. Eckert submitted to Defendant Mazzatesta in April 2005; Plaintiff testified that Ms. Eckert requested that Plaintiff teach multicultural history and sociology rather than Mr. Osovella.  (*Id.* at 183:12-15; 184:2-185:19.)  Again, Defendant Mazzatesta assigned Mr. Osovella to teach multicultural history and sociology and Plaintiff to teach world cultures and U.S. history.  (*Id.* at 184:2-185:19.)

There is no evidence that Defendants Hasson or Hollins participated in

14

the decisions regarding Plaintiff's teaching assignments.

### ii.   Being a "Floater"

Upon arriving at new CDHS for the start of the 2004-05 school year, Plaintiff discovered that she had not been assigned a room at the school. (*Id.* at 158:19-25.) Instead, she was to work off of a cart, in six different classrooms on two floors over the course of the school day. (*Id.* at 158:19-22.) Teachers so assigned to rotate classrooms are called "floaters." (Mazzatesta Dep. I 80:14-25.)

Defendant Mazzatesta decided which teachers would have a permanent room for the school year and which teachers would be floaters. (*Id.*) He makes this decision based on the "building seniority" of a teacher. (*Id.*) The longer a teacher has worked in the building, the more likely he or she is to receive a permanent room assignment. (Mazzatesta Dep. I 80:21-25.) The decision is not based on the teacher's length of service in the School District; thus, a teacher with twenty years of experience teaching in the School District who is a recent transfer to new CDHS will not displace a teacher with five years in the School District who has been at new CDHS for those five years. (*Id.* at 81:1-8.) Because every teacher at new CDHS moved in when the building opened in 2004-05, Defendant Mazzatesta may have "carried over" teachers' building seniority from old CDHS. (Ferguson Dep. 157:25-159:1.)

In May 2005, Defendant Mazzatesta issued a request for teacher input on their "wish lists" for the following school year. (Smith Dep. I 183:16-21.) Plaintiff requested a permanent classroom. (*Id.* at 183:22.) For school year 2005-06 Plaintiff was again assigned to be a floater, while three other teachers, some with less seniority than she had, were given permanent rooms. (*Id.* at 183:22-184:2.)

Plaintiff testified that it is understood at CDHS that "you are given certain assignments [including as a floating teacher] as a result of disfavor with [Defendant] Mazzatesta." (*Id.* at 201:3-7.) Conversations with other teachers confirmed this understanding. (*Id.* at 200:11-201:7; *see* Smith Dep. II 294:16-295:2.) Further, Plaintiff testified that a social studies teacher in her first year of teaching and her first year at new CDHS received a permanent classroom for school year 2005-06, while she was still assigned to be a floater. (Smith Dep. II 290:13-291:7.) There is a "generally accepted practice that if there is going to be a floater, it is going to be somebody that is newer to the district" according to Mr. Ferguson. (Ferguson Dep. 32:23-25.)

There is no evidence that Defendants Hasson or Hollins participated in the decisions assigning Plaintiff to be a floater.

### 2.   Coaching

Plaintiff was hired to be the assistant coach for the cross-country team at old CDHS each school year from 1988 through the fall season in 2002. (Defs.' Stmt. of Mat'l Facts ¶¶ 5, 84; Pl.'s Counter-Stmt. of Mat'l Facts ¶¶ 5, 84.) The procedure for hiring an assistant coach in the School District is in some dispute, but appears to be as follows: the head coach asks a person to be the assistant coach for the team. (*See* Defs.' Stmt. of Mat'l Facts ¶ 85; Pl.'s Counter-Stmt. of Mat'l Facts ¶ 85.) If that person agrees, the head coach submits her name to the Athletic Director for the School District. (*See* Defs.' Stmt. of Mat'l Facts ¶ 86; Pl.'s Counter-Stmt. of Mat'l Facts ¶ 86.) The Athletic Director may discuss the nominations with the principal of the school at which the person will coach. (Bressi Dep. 89:6-21, Sept. 21, 2006.) The Athletic Director submits the name of the proposed assistant coach

to the secretary of the School Board.  (*Id.* at 109:11-110:2.)  The Superintendent presents the recommendations made by the Athletic Director to the Board.  (*Id.* at 110:20-111:9.)  The School Board makes the final decision as to whether a person recommended as an assistant coach will be hired.  (Mausner Dep. 20:3-8.)

Mr. Leuschner asked Plaintiff in the spring of 2003 if she would like to be assistant coach again in the fall.  (Smith Dep. I 136:2-7.)  She said yes.  (*Id.*)  Mr. Leuschner submitted her name to the Athletic Director and Defendant Mazzatesta approved.  (Bressi Dep. 88:25-89:21.)  Subsequently, as related *supra*, Plaintiff was placed on medical leave then took a medical sabbatical for the 2003-04 school year. As a result, Cindy Radich of the personnel department approached Defendant Hasson to inquire if Plaintiff would be allowed to coach while on sabbatical. (Hasson Dep. I 100:3-8.)  Defendant Hasson informed Ms. Radich of her policy that teachers out on medical sabbatical are not allowed to coach because "it is too confusing to explain to people that you're paying them to be off sick, but you're also paying them to coach."  (*Id.* at 100:9-15.)

Defendant Hasson met with three members of the School Board to set the agenda for an executive session of the Board in August 2003.  (*Id.* at 120:2-21.) During that meeting, she opened the personnel report made by Mr. Bressi.  (*Id.* at 121:7-11.)  The report recommended that Plaintiff be hired as an assistant coach for the cross-country team at old CDHS.  (*Id.* at 121:12-15.)  The Board members asked Defendant Hasson to call Mr. Bressi in to the executive session to explain the reasons that he recommended Plaintiff.  (*Id.* at 121:13-15.)  She agreed to ask Mr. Bressi to attend.  (Hasson Dep. II 5:23-25, Oct. 2, 2006.)

At the executive session, the Board members discussed their concern

17

that Plaintiff was being recommended for a position at old CDHS, the very building that she felt had made her sick. (*Id.* at 6:1-9.) Mr. Mausner asked whether the assistant coaching position would require her to go into the building. (Mausner Dep. 42:14-18.) "[T]he answer was yes, the assistant coach must go in" for locker room supervision or to escort an injured runner to the trainer or the nurse.[5] (*Id.* at 42:17-20.) Mr. Mausner said that he "could not support somebody going into a building that they felt had an adverse [effect] on their health." (*Id.* at 42:21-22.) After some discussion, the Board agreed to pull the recommendation and refrained from voting on Plaintiff's name. (*Id.* at 43:2-3.)

Defendant Hasson was present at the executive session with the Board, as was Defendant Hollins. (Hasson Dep. II 33:15-34:6.) The record is unclear as to whether Mr. Bressi attended the executive session. Mr. Bressi does not recall attending the session. (Bressi Dep. 35:15-21; *see* Mausner Dep. 53:11-54:4.) Defendants Hasson and Hollins recall that he attended. (Hasson Dep. II 18:9-19; Hollins Dep. II 6:5-14, 16:7-10, Oct. 2, 2006.) Defendant Hasson testified that Mr. Bressi spoke to the reasons for his recommendation that Plaintiff be hired as assistant coach at old CDHS. (Hasson Dep. II 11:21-12:14; 34:1-4.) She did not make any recommendations herself. (*Id.* at 34:1-4.) Defendant Hollins did not participate in the discussion. (*Id.* at 34:5-12; Hollins Dep. II 19:1-22.)

Upon learning of the Board's decision not to hire her as an assistant coach for the 2003 cross-country season, Plaintiff had "the sense" that it was "because of my asking questions and seeking knowledge." (Smith Dep. I 141:16-

---

[5] Plaintiff claims that she would not have had to go into old CDHS to coach cross-country. (Pl.'s Counter-Stmt. of Mat'l Facts ¶ 96; Pl.'s Ex. 67.) She was not at the executive session to argue the point.

19.)  Mr. Leuschner got the impression from Mr. Bressi that the Board's decision not to hire her was related to the suits she had filed.  (Leuschner Dep. 46:13-47:25, Sept. 15, 2006.)  Mr. Ferguson claims that, according to Defendant Hasson, "in light of the fact that she was bringing suit against the district, if [Plaintiff] thought that she would ever get a coaching position that she was mistaken."  (Ferguson Dep. 96:23-97:3.)

It is somewhat disputed whether Mr. Leuschner submitted a request that Plaintiff be his assistant coach for the 2004 fall season.  Mr. Leuschner asked Plaintiff, in the spring of 2004, if she would like to be assistant coach for the fall season.  (Leuschner Dep. 39:3-40:20; Smith Dep. I 150:19-22.)  She said yes. (Smith Dep. I 150:19-22.)  Mr. Leuschner recalls writing her name on the official request form for 2004 and submitting that form to the Athletic Director.  (Leuschner Dep. 41:14-42:25.)  Mr. Bressi told Mr. Leuschner, before submitting Plaintiff's name to the Board, that he did not believe the Board would hire Plaintiff "any more this time than it did the last time."  (Bressi Dep. 67:8-20.)  According to Mr. Bressi, Mr. Leuschner withdrew Plaintiff's name and requested another person.  (*Id.* at 70:1-71:25.)  Mr. Leuschner was unsure as to whether he submitted Plaintiff's name for assistant cross-country coach, or the name of another person.  (Leuschner Dep. 49:5-15.)

It is undisputed that Plaintiff was not requested as assistant cross-country coach for the 2005 season or any subsequent season.  (Defs.' Stmt. of Mat'l Facts ¶ 101; Pl.'s Counter-Stmt. of Mat'l Facts ¶ 101.)  Around that time, Plaintiff and the president of the teacher's union advised Mr. Leuschner that continuing to submit her name would be unwise until "all of this settles out."  (Leuschner Dep.

67:21-68:21; Pl.'s Counter-Stmt. of Mat'l Facts ¶ 101.)

## B.   Procedural History

On May 17, 2005, Plaintiff sued the School District and individual Defendants under 42 U.S.C. § 1983 for violation of her First Amendment right to exercise free speech without retaliation by her employer or supervisors.  (Doc. 1.) Plaintiff filed an amended complaint on May 24, 2005.  (Doc. 2.)  Defendants moved for summary judgment on March 16, 2007.  (Doc. 60.)  Their supporting brief was filed on the same day.  (Doc. 62.)  Plaintiff filed her brief in opposition on April 20, 2007.  (Doc. 69.)  Defendants filed a reply brief on May 3, 2007.  (Doc. 70.)  Accordingly, this matter is ripe for disposition.

## II.      Legal Standard

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *accord Saldana v. Kmart Corp.*, 260 F.3d 228, 231-32 (3d Cir. 2001).  A factual dispute is "material" if it might affect the outcome of the suit under the applicable law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party.  *Id.*  The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party. *Saldana*, 260 F.3d at 232.

Once the moving party has shown that there is an absence of evidence

to support the claims of the non-moving party, the non-moving party may not simply rest on the allegations in its complaint. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* (internal quotations omitted); *see also Saldana*, 260 F.3d at 232 (citations omitted). Summary judgment should be granted when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "'Such affirmative evidence – regardless of whether it is direct or circumstantial – must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance.'" *Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of West Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989)).

## III.        Discussion

Plaintiff alleges that Defendants retaliated against her in numerous ways because she spoke out about the mold in public schools. Defendants argue that they should be granted summary judgment on Plaintiff's retaliation claims because Plaintiff has failed to show a genuine issue of material fact as to the causal connection between her speech and the adverse employment actions. Further, Defendants submit that they would have taken the same action towards her for reasons unrelated to her speech. In the alternative, the individual Defendants claim that they are entitled to qualified immunity on all claims. The individual Defendants also argue that they should be granted summary judgment on Plaintiff's demand for

punitive damages because Plaintiff has not demonstrated that Defendants intentionally disregarded her federally-protected rights.

## A.   First Amendment Retaliation

As an initial matter, to state a claim under 42 U.S.C. § 1983, a plaintiff must show that a defendant, acting under the color of state law, subjected her or caused her to be subjected to the deprivation of her Constitutional or federal rights. A plaintiff must show that each defendant "individually participated in the alleged constitutional violation or approved of it."[6] *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 173 (3d Cir. 2005).  Unsupported allegations that a defendant participated in or acquiesced to an alleged constitutional violation are not sufficient to withstand summary judgment.

On summary judgment, the court is presented with arguments regarding Plaintiff's allegation that Defendants deprived her of her constitutional right to speak upon matters of public concern without retaliation from her employer or supervisors.  *See McKee v. Hart*, 436 F.3d 165, 169 (3d Cir. 2006); *Brennan v. Norton*, 350 F.3d 399, 419 (3d Cir. 2003).  "Determining whether a plaintiff's First Amendment rights were adversely affected by retaliatory conduct is a fact intensive

---

[6] The court will analyze the issues with respect to the individual Defendants only.  The parties have not briefed the issue of liability for Defendant Central Dauphin School District under *Monell v. Department of Social Services,* 436 U.S. 658 (1978).  For liability to attach to a municipality under § 1983, a plaintiff must show that the municipality itself caused a constitutional violation. *Id.* at 694.  That is, a municipality is liable under § 1983 when "through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Bd. of County Comm'rs v. Brown,* 520 U.S. 397, 405 (1997).  A municipality is not liable for the constitutional violations committed by its employees under the theories of *respondeat superior* or vicarious liability. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 736 (1989).  Defendant School District is a municipality for the purposes of *Monell* liability.  *See id.* at 735; *Johnson v. Elk Lake Sch. Dist.*, 283 F.3d 138, 144 n.1 (3d Cir. 2002).  Without the benefit of briefing, the court will refrain from making any decision as to the School District at this time.

inquiry focusing on the status of the speaker, the status of the retaliator, the relationship between the speaker and the retaliator, and the nature of the retaliatory acts." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 686 (4th Cir. 2000) (quoted in *Brennan*, 350 F.3d at 419). In the employment context, a retaliation claim triggers a burden-shifting three-step process of analysis: first, the plaintiff must show that her conduct was constitutionally protected; second, she must show that her constitutionally-protected conduct was a "substantial" or "motivating" factor in an adverse employment action; third, the burden shifts to the defendant to show "by a preponderance of the evidence that it would have reached the same decision even in the absence of the protected conduct." *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Suppan v. Dadonna*, 203 F.3d 228, 235 (3d Cir. 2000). The first factor is a question of law, but the second and third factors are questions of fact. *Curinga v. City of Clairton*, 357 F.3d 305, 310 (3d Cir. 2004).

Defendants concede, for the purposes of summary judgment only, "that Plaintiff has stated facts sufficient to demonstrate that she engaged in [constitutionally-protected] speech regarding mold in School District facilities and resulting health problems," thus satisfying the first prong of the retaliation test. (Doc. 62 at 6.) Accordingly, the court need only address the questions of fact presented by the second and third prongs.

### 1. Was Plaintiff's Speech a "Substantial" or "Motivating" Factor in an Adverse Employment Action?

Under the second prong of the retaliation test, the court must determine 1) whether the acts attributed to Defendants are adverse employment actions and 2) if so, which Defendants personally participated in the actions such that they may be liable under § 1983. The court will then examine whether Plaintiff's speech was a

substantial or motivating factor in any adverse employment actions taken.

### a.   Adverse Employment Actions

Defendants concede, for summary judgment purposes only, that "placing [Plaintiff] on medical leave and failing to award her the assistant coaching positions are adverse employment actions" for which relief may be sought under § 1983.  (Doc. 62 at 6.)  Plaintiff submits that Defendants took additional adverse employment actions against her,[7] however, in that 1) Defendant Hasson made false statements to the press about the conditions at old CDHS;  2) Defendant Mazzatesta told others that he believed that Plaintiff was spreading falsehoods; 3) Defendants instructed her to refrain from discussing her health and the environment at old CDHS in the classroom; 4) Defendants withheld information or provided misleading information regarding the state of air quality at old CDHS and LJHS; and 5) after she returned from her medical sabbatical, for school year 2004-05, Defendant Mazzatesta retaliated against her by assigning her to teach classes with which she was unfamiliar and by assigning her to work off of a cart rather than in a permanent classroom.  (*See* Doc. 69 at 14-18.)

An adverse employment action must inflict the requisite level of injury upon a plaintiff to be cognizable under § 1983, a tort statute.  *Suppan*, 203 F.3d at 235 (quoting *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982)).  The action must be more than de minimis, *Brennan*, 350 F.3d at 419, but may be relatively minor, *O'Connor v. City of Newark*, 440 F.3d 125, 127-28 (3d Cir. 2006).  The test focuses

---

[7]   The amended complaint states that Plaintiff "was arbitrarily denied the opportunity to work and to take advantage of all of the benefits and emoluments afforded teachers in similar situations."  (Doc. 2 ¶ 17.)  While this statement may be broad and general, it is not speculative.  *See Bell Atlantic Corp. v. Twombley*, — U.S. —, 127 S. Ct. 1955, 1965 (2007).  Discovery has produced sufficient evidence to support the pleading of this claim.

on whether the act was "sufficient to 'deter a person of ordinary firmness' from exercising his or her First Amendment Rights." *Suppan*, 203 F.3d at 235; *see also Rutan v. Republican Party of Ill.*, 497 U.S. 62, 76 n.8 (1990). Acts found sufficient to deter a person of ordinary firmness from exercising her First Amendment rights include adverse decisions regarding hiring, rehiring, promoting, transferring, and recalling an employee. *Brennan*, 350 F.3d at 419. Decisions that affect other terms and conditions of employment may also be actionable, "even 'an act of retaliation as trivial as failing to hold a birthday party for a public employee'" if intended to punish her for exercising her free speech rights." *O'Connor*, 440 F.3d at 128 (quoting *Rutan*, 497 U.S. at 76 n.8)). Criticism, false accusations, and verbal reprimands, however, have been found not sufficient to deter an employee from exercising her First Amendment rights. *Brennan*, 350 F.3d at 419. Further, "an entire campaign of harassment which though trivial in detail may have been substantial in gross" may be actionable under § 1983. *Suppan*, 203 F.3d at 235 (internal quotation omitted); *accord Brennan*, 350 F.3d at 419 n.16.

Some of the alleged wrongs against Plaintiff are not adverse employment actions, namely the public comments by Defendants Hasson and Mazzatesta and the instructions from all Defendants that Plaintiff was not to discuss her health problems or the environmental conditions at old CDHS during class time. Some of the alleged wrongs are actionable as adverse employment actions, however: withholding information regarding the environmental conditions at LJHS, being placed on FMLA leave in the fall of 2003, not being hired as the assistant cross-country coach, and being assigned to work in unfavorable job conditions upon her return to teaching at new CDHS. The court will address each in turn.

25

### i.   Defendant Hasson's Comments to the Media

The comments made by Defendant Hasson to the media, espousing views contrary to Plaintiff's regarding the environment at old CDHS did not constitute an adverse employment action.  The comments did not affect the terms or conditions of Plaintiff's employment.  Open debate on a matter of public concern is not only permissible, it is anticipated and encouraged by the First Amendment.  The possibility of public disagreement is insufficient to deter a person of ordinary firmness from exercising her First Amendment Rights.  *Bradshaw v. Twp. of Middletown*, 296 F. Supp. 2d 526, 542 (D. N.J. 2003); *see Shingara v. Miller*, No. 1:05-CV-1807, 2007 WL 570080, at *3 (M.D. Pa. Feb. 15, 2007).

### ii.   Defendant Mazzatesta's Comments On the Veracity of Plaintiffs' Public Statements

Assuming without deciding that Defendant Mazzatesta told others that Plaintiff was lying about the state of old CDHS, his comments were not an adverse employment action.  At a minimum, his comments demonstrated the kind of public disagreement described with respect to Defendant Hasson's comments to the media.  At most, they amount to the "false accusations" described by *Brennan* as not sufficient to state a claim for retaliation under § 1983.  *See Bradshaw*, 296 F. Supp. 2d at 542 (holding that a defendant's statement in the newspaper that "the comments made by . . . [the plaintiff] were a lie and that [the plaintiff] knew it was a lie" did not rise to the level required to deter a plaintiff from exercising his First Amendment rights).  Defendant Mazzatesta's statements were not sufficient to deter a person of ordinary firmness from exercising her First Amendment rights.

### iii.   The Meeting on April 29, 2002

Plaintiff alleges that Defendant Hasson "instructed [Defendants]

26

Hollins and Mazzatesta to threaten [Plaintiff]" when she returned to old CDHS on April 29, 2002 (Pl.'s Counter-Stmt. of Mat'l Facts ¶ 141) and that Defendants Hollins and Mazzatesta subsequently did so (Doc. 69 at 15).  The content of Defendant Hasson's instructions to Defendants Hollins and Mazzatesta and their subsequent exchange with Plaintiff is undisputed.  Plaintiff was instructed to teach only the curriculum assigned to her and not to discuss her health or the environmental conditions at old CDHS.  This instruction did not constitute an adverse employment action sufficient to deter Plaintiff from exercising her right to free speech.

As a public employee, Plaintiff has the right, "in certain circumstances, to speak *as a citizen* addressing matters of public concern."  *Garcetti v. Ceballos*, — U.S. —, 126 S. Ct. 1951, 1957 (2006) (emphasis added).  Her speech *as a teacher* may be constrained by her supervisors in some contexts.  *See id.* at 1960 ("[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes and the Constitution does not insulate their communications from employer discipline.").  Government employers require a degree of control over their employee's words and actions while on the job in the interest of efficient provision of public services.  *Id.* at 1958.  Here, Defendants had a distinct interest in restricting Plaintiff's speech in the classroom, during school time, to the curriculum assigned.  The public service that schools provide is instruction to children on specific topics deemed appropriate and necessary for their education.  Requiring Plaintiff to confine her classroom comments to curriculum was not an adverse employment action.  Further, the restriction on her speech in the classroom was not an action sufficient to deter a

person of ordinary firmness from exercising her First Amendment rights *outside* of the classroom.

### iv.  Withholding of Information on Environmental Conditions

Plaintiff alleges that Defendants withheld information from her regarding the environmental conditions at old CDHS and at LJHS in retaliation for her public speech on mold at old CDHS.  With respect to old CDHS, she claims that Defendants refused to release information to Plaintiff and her doctors so that she could receive appropriate medical treatment.  The court infers, from the record evidence, that Plaintiff is referring to the report created by ALSI after it tested the air at old CDHS.  Plaintiff wanted the report on a particular day, March 18, 2002, because she was going to see a doctor and wanted to provide information about the air quality at old CDHS during her appointment.  Plaintiff's doctor was faxed a copy of ALSI's preliminary findings on that date and before the final report was made publicly available.  Although Plaintiff claims that "vital information was missing" from the preliminary findings, her own evidence demonstrates that ALSI, not any Defendant, withheld that information until more conclusive results were available.  Further, ALSI's final report was made publicly available soon after.  There is no evidence that any Defendant withheld the report about old CDHS from Plaintiff and her doctors.[8]

Plaintiff's request for information about LJHS presents a different

---

[8] Plaintiff further alleges that Defendant Mazzatesta withheld information from her by refusing to allow her union representative in to old CDHS to make a visual inspection during the remediation of the school.  Even if such an action could be considered "withholding of information," the court finds this allegation to be utterly without merit because it is undisputed that Defendant Mazzatesta allowed Mr. Ferguson and Ms. Gostin of the Health Department to tour the school at their leisure on the same date of their initial request.

scenario, however.  She began requesting information about the air quality at the junior high school in July 2002.  It is clear that Defendant Hasson became aware of these requests, at the latest, on or before August 15, 2002.  On that date she responded to Plaintiff by letter.  Defendant Hasson stated that she, the LJHS principal, and human resources were in the process of responding to Plaintiff's requests.  Defendant Hasson provided some of the information requested to Plaintiff's doctor on September 27, 2002.

The record demonstrates, however, that as early as June 20, 2002, Defendant Hasson was aware that there was mold on the gym floor at LJHS.  There is no explanation in the record as to why Defendant Hasson, aware of the mold at LJHS as early as June 20, and aware of Plaintiff's request for information about such mold at least by August 15, would wait until September 27 to share the information with Plaintiff's physician.

The court concludes that the air quality at LJHS was a condition of Plaintiff's employment because of her extreme sensitivity to airborne mold.  Plaintiff's physical health and ability to perform her duties as a teacher were directly related to the presence or absence of mold in the air.  Although this is not the typical employment decision upon which lawsuits are based, the circumstances of this case lead the court to the conclusion that the act of withholding information about the environment at LJHS was an adverse employment action.  It may evolve at trial that Defendant Hasson did not have any punitive reason for not disclosing information about the environment at LJHS earlier than September 27, 2002.  For present purposes, however, the court concludes that the possibility that such information would be withheld as punishment, in this context, is sufficient to deter a person of

ordinary firmness from exercising her First Amendment rights.

### v.   **"Forced" Medical Leave in 2003**

Defendants' brief concedes that placing Plaintiff on medical leave was an adverse employment action sufficient to deter Plaintiff from exercising her right to free speech.  The court addresses the matter here because not every Defendant personally participated in the act of placing her on leave.  The record is devoid of evidence that Defendant Mazzatesta played any role in Plaintiff's medical leave.  Plaintiff was assigned to Linglestown Junior High School at the time she was put on medical leave.  Defendant Mazzatesta was the principal of old CDHS at the time.  He testified that, because she was not in his building, he had nothing to do with her medical leave.  (Mazzatesta Dep. 75:22-77:9.)  Plaintiff's conclusory statement that his "involvement can be established through inference and circumstantial evidence" is not sufficient to withstand summary judgment as to Defendant Mazzatesta on this issue. *See Celotex Corp.*, 477 U.S. at 324.

There is a genuine issue of material fact as to the personal involvement of Defendants Hollins and Hasson, however.  Although Defendant Hollins testified that she was not involved in placing Plaintiff on medical leave, Mr. Ferguson indicated that she initially suggested the leave.  Further, Dr. Hasson's letter to Plaintiff on August 15, 2002, indicated that a request for FMLA leave should be directed to Defendant Hollins.  Although this is not conclusive evidence of Defendant Hollins's participation in placing Plaintiff on leave, it creates an issue of fact for the jury.  With respect to Defendant Hasson, the Superintendent is one of the main participants in setting the agenda for the School Board meetings.  (Mausner Dep. 17:19-18:4; *see* Hasson Dep. I 120:2-10.)  The court can only conclude that

someone had to present the request that Plaintiff be placed on FMLA leave to the Board before the Board could approve it. Again, the evidence is not dispositive that Defendant Hasson personally took deliberate action to place Plaintiff on FMLA leave, but the record does show that there is an issue of fact as to this question.

### vi.   Failure to Hire Plaintiff as Assistant Coach for Cross-country

Defendants concede that the failure to hire Plaintiff as an assistant coach for the cross-country team was an adverse employment action sufficient to deter Plaintiff from exercising her right to free speech. The record demonstrates that Defendant Hollins did not personally participate in any part of the Board's decision not to hire Plaintiff. Defendants Hasson and Hollins testified that Defendant Hollins had no role. (Hasson Dep. II 34:5-12; Hollins Dep. II 19:1-6.) Plaintiff has not identified specific facts showing that Defendant Hollins took part. *See Celotex Corp.*, 477 U.S. at 324. Additionally, there is no dispute that if Defendant Mazzatesta participated in submitting Plaintiff's name as a proposed assistant coach, he supported the recommendation and did nothing to defeat it. (Bressi Dep. 89:6-90:1.) He was not present at the School Board meeting where the decision not to hire her was made. Plaintiff has failed to point to record evidence creating a genuine issue of material fact as to Defendant Mazzatesta's participation in the denial of the assistant coaching job. *See Celotex Corp.*, 477 U.S. at 324.

Because it is disputed what, exactly, happened in the School Board meeting and who answered the Board's questions about Plaintiff's condition and the requirements of the job, there remains an open question of fact as to Defendant Hasson's personal involvement in the decision not to hire Plaintiff as an assistant coach. Further, there the record is unclear as to whether Plaintiff's name was

31

submitted to the administration or to the Board for the 2004 season, and if so, at
what stage in the process it was rejected.

### vii.   Benefits and Emoluments Afforded Similarly-Situated Teachers

Plaintiff submits that upon her return to teaching at the new Central
Dauphin High School for school year 2004-05, Defendant Mazzatesta assigned her
"to teach . . . two subjects that she had never taught previously except for one year"
and required her to "work out of a cart, instead of a classroom, even though one was
available." (Doc. 69 at 7.)  These decisions are not de minimis; they go to
conditions at the heart of Plaintiff's employment.  They determine the content that
she will teach and where she will teach it, every single day of a school year.  The
court concludes that the threat of being assigned unfamiliar material to teach and six
different classrooms in which to teach it is sufficient to deter a person of ordinary
firmness from exercising her First Amendment rights.

### viii.   Summary of Adverse Employment Actions

The court concludes that the following are not adverse employment
actions for which relief may be sought under § 1983: 1) Defendant Hasson's
comments to the media about the state of the environment at old CDHS; 2)
Defendant Mazzatesta's comments that Plaintiff was lying about the mold at old
CDHS; and 3) Defendants' instructions about and participation in the meeting on
April 29, 2002 wherein Plaintiff was instructed to teach curriculum only during her
classes.  The following actions are adverse employment actions for which relief may
be sought under § 1983 against the individual Defendants named: 1) withholding
information about the environmental condition at LJHS by Defendant Hasson; 2)
placing Plaintiff on medical leave by Defendants Hasson and Hollins;  3)

participating in the decision not to hire Plaintiff as an assistant coach by Defendant Hasson; 4) assigning Plaintiff to teach unfamiliar classes and requiring her to be a floater by Defendant Mazzatesta.

### b.    **"Substantial" or "Motivating" Factor**

Having identified the adverse employment actions, Plaintiff carries the burden of showing that her protected speech was a "substantial or motivating factor" in Defendants' decision to take those actions. *See Suppan*, 203 F.3d at 235 (citing *Mt. Healthy*, 429 U.S. at 287). There must be a causal nexus between the employee's speech and the adverse employment action. *Brennan*, 350 F.3d at 420. That nexus may be shown by demonstrating that the adverse employment action followed soon after the protected speech, evidence of continuing animosity towards the employee, incidents wherein supervisors enforced discipline or policy against the employee disparately vis-a-vis other employees, or other features of the particular circumstances presented. *Id.* at 420-21. Unsupported allegations reflecting "a myopic interpretation of events wherein retaliatory motives permeated the defendants' every move" do not suffice to demonstrate the nexus between a plaintiff's speech and an adverse employment action. *Id.* at 419.

While Defendants concede that Plaintiff engaged in protected speech, they do not identify the time period in which she did so. Clearly, Plaintiff's press release in June 2002 was public speech, but the evidence demonstrates that Plaintiff spoke to parents, other teachers, and union representatives about the environmental conditions within School District buildings at various times throughout the chronology of this case. Because Defendants have not identified a point in time that Plaintiff's protected speech ceased, the court will not infer one. Thus, the court

deems Plaintiff's protected speech to have been ongoing.

Aside from the question of timing, the court concludes that Plaintiff has produced sufficient evidence to demonstrate a genuine issue of material fact as to whether Defendants' acts over time were causally related to her protected speech. Here, Plaintiff's testimony that she felt "threatened" by Defendants Hollins and Mazzatesta, at the instruction of Defendant Hasson, must be credited.  Mr. Ferguson testified that Defendant Hasson told him that Plaintiff's suit against the District would preclude her from being hired as an assistant coach.  Ms. Hoachlander testified she felt that Defendant Mazzatesta was asking her to forward Plaintiff's emails in an effort to discredit Plaintiff.  While these words or acts do not provide the basis for a retaliation claim in terms of injury to Plaintiff, they do suggest that the adverse employment actions described above were motivated by animus engendered by Plaintiff's public speech.  Further, there is evidence that School District policies and policies within new CDHS were applied differently to Plaintiff than they were applied to other teachers.  Plaintiff and Mr. Ferguson testified that her course work and assignment as floater were not typical for a teacher with her longevity of service and were considered within the school to be punitive.

From the foregoing, the court finds that Plaintiff has satisfied her summary judgment burden of adducing evidence that her exercise of free speech was a "substantial" or "motivating" factor in the adverse employment actions alleged. The court moves on to the third prong of the retaliation test.

### 2. **Would Defendants Have Made the Same Decisions Absent Plaintiff's Speech?**

If a plaintiff demonstrates the first two prongs of the retaliation test, the burden shifts to the defendants to show "by a preponderance of the evidence that

[they] would have reached the same decision even in the absence of the protected conduct." *Suppan*, 203 F.3d at 235 (quoting *Mt. Healthy*, 429 U.S. at 287).  As succinctly put in *Suppan*, the defendants must demonstrate that the plaintiff's protected conduct was *not* the but-for cause of the adverse employment action.  203 F.3d at 236.  The rationale is that an employee is entitled to be in the same position that she would have been, had she not exercised protected speech.  *Id.*  If she occupies the same position that she would have had she not spoken out, she has not been injured and has no cause of action.  *Id.*

Here, Defendants claim that Plaintiff was treated exactly the same as she would have been had she not exercised her free speech rights.  They submit that the decisions to place her on medical leave and not to hire her as an assistant coach were made in the interest of protecting Plaintiff's health, not to punish her for speaking out about the mold at old CDHS.  As to her assignments at new CDHS, Defendant Mazzatesta testified that he made the teaching assignment out of deference to the teacher who had been teaching Plaintiff's chosen subjects.  He also testified that Plaintiff was made a floating teacher because she did not have sufficient building seniority to be assigned to a permanent classroom.

Defendants have produced sufficient evidence for a reasonable jury to find that they would have reached the same decisions even if Plaintiff had not spoken publicly.  As noted in *Curinga*, the two prongs of the retaliation test that the court has addressed are issues of fact.  357 F.3d at 310. Faced with facts from Plaintiff tending to prove that Defendant's motives were retaliatory and facts from Defendants tending to prove that their motives were pure, the court is at an impasse.  The decision of which evidence to credit and which to reject properly lies with the

jury, not the court on summary judgment.  *See McCullough v. City of Atlantic City*, 137 F. Supp. 2d 557, 569 (D. N.J. 2001).

### B.   <u>Qualified Immunity</u>

Qualified immunity is an affirmative defense that shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Wilson v. Russo*, 212 F.3d 781, 786 (3d Cir. 2000).  A right is "clearly established" when, objectively, "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Qualified immunity applies when an objectively reasonable official under the same circumstances would have believed his or her conduct was lawful.  *Hunter v. Bryant*, 502 U.S. 228 (1991); *Sharrar v. Felsing*, 128 F.3d 810, 826 (3d Cir. 1997).  If it applies, qualified immunity provides more than immunity from recovery of damages.  It "is the 'entitlement not to stand trial or face the other burdens of litigation.'" *Thomas v. Independence Twp.*, 463 F.3d 285, 291 (3d Cir. 2006) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).  If there are "underlying historical facts in dispute that are material to the resolution of the question[ ] whether the defendants acted in an objectively reasonable manner in view of the existing law and facts available to them," however, summary judgment is not appropriate.  *Sharrar*, 128 F.3d at 828; *accord McCullough*, 137 F. Supp. 2d at 572.

The right of a public employee to speak on matters of public concern without retaliation is clearly established and has been since before the facts that led

to this law suit began to occur. *Mt. Healthy*, 429 U.S. at 287; *Suppan*, 203 F.3d at 235. The qualified immunity question in a First Amendment retaliation case turns on whether "officials reasonably could believe that their motivations were proper even when their motivations were in fact retaliatory." *Larsen v. Senate of the Comm. of Pa.*, 154 F.3d 82, 94 (3d Cir. 1998). This inquiry requires a factual determination as to the officials' subjective beliefs and motivations. *Id.* Accordingly, "[m]otive is a question of fact that must be decided by the jury, which has the opportunity to hear the explanations of both parties in the courtroom and observe their demeanor." *Monteiro v. City of Elizabeth*, 436 F.3d 397, 405 (3d Cir. 2006); *see Crawford-El v. Britton*, 523 U.S. 574, 600 (1998). In light of the disputed issues of fact in this case as to Defendants' motives and subjective beliefs, the court cannot rule as a matter of law that Defendants' actions were objectively reasonable. Thus, Defendants will be denied qualified immunity.

### C. Punitive Damages

A defendant will be liable for punitive damages under § 1983 when a plaintiff shows the defendant's conduct to be "at a minimum, reckless or callous." *Brennan*, 350 F.3d at 428-29 (quoting *Savarese v. Agriss*, 883 F.2d 1194, 1204 (3d Cir. 1989)). Such damages will also be allowed if the defendant's conduct was "intentional or motivated by evil motive," but this higher standard is not required. *Id.* at 429. Punitive damages, however, "require more than the retaliatory motive itself." *Id.* at 429-30.

As noted, Defendants' motives and subjective beliefs are an issue of disputed fact. Accordingly, the court will defer ruling on the issue of punitive damages until all evidence has been presented at trial.

**IV.**          **Conclusion**

          For the reasons stated above, Defendants' motion for summary judgment will be denied in part and granted in part.  Summary judgment will be denied as to the decision to withhold information regarding the environmental condition of LJHS by Defendant Hasson; the decision to place Plaintiff on medical leave by Defendants Hasson and Hollins; the decision not to hire Plaintiff as assistant cross-country coach by Defendant Hasson; and Plaintiff's course assignment and designation as a "floater" teacher at new CDHS by Defendant Mazzatesta.  Summary judgment will be denied as to any actions taken by Defendant School District because its liability under *Monell* was not addressed on briefs.  The individual defendants will be denied qualified immunity.  The court will refrain from ruling on punitive damages at this time.  Summary judgment will be granted in all other respects.  An appropriate order will follow.

                                        s/Sylvia H. Rambo
                                        SYLVIA H. RAMBO
                                        United States District Judge

Dated:  June 22, 2007.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

VICKIE SMITH,                        :      Civil No. 1:05-CV-01003
                                     :
            **Plaintiff**            :      **JUDGE SYLVIA H. RAMBO**
                                     :
      **v.**                         :
                                     :
**CENTRAL DAUPHIN SCHOOL**           :
**DISTRICT, BARBARA HASSON,**        :
**YVONNE HOLLINS, and**              :
**RICHARD MAZZATESTA,**              :
                                     :
            **Defendants**           :

# O R D E R

In accordance with the foregoing memorandum of law, Defendants motion for summary judgment (Doc. 60) is **DENIED** in part and **GRANTED** in part as follows:

1) Summary judgment is **DENIED** as to the decision to withhold information regarding the environmental condition of LJHS by Defendant Hasson;

2) Summary judgment is **DENIED** as to the decision to place Plaintiff on medical leave by Defendants Hasson and Hollins;

3) Summary judgment is **DENIED** as to the decision not to hire Plaintiff as assistant cross-country coach by Defendant Hasson;

4) Summary judgment is **DENIED** as to Plaintiff's course assignment and designation as a "floater" teacher at new CDHS by Defendant Mazzatesta;

5) Summary judgment is **DENIED** as to Defendant Central Dauphin School District because its liability as a municipality was not addressed in briefing;

6) The individual Defendants are **DENIED** qualified immunity;

7) The court refrains from ruling on punitive damages until the submission of all evidence at trial; and

8) Summary judgment is **GRANTED** in all other respects.

s/Sylvia H. Rambo
SYLVIA H. RAMBO
United States District Judge

Dated:  June 22, 2007.